FRONT ROYAL AND WARREN COUNTY INDUSTRIAL PARK CORP., Plaintiff,

v.

TOWN OF FRONT ROYAL, VIRGINIA, et al., Defendants.

Fred W. McLAUGHLIN, et ux., Plaintiffs,

v.

TOWN OF FRONT ROYAL, VIRGINIA, et al., Defendants.

Civ. A. Nos. 87–0019–H, 87–0020–H.

United States District Court, W.D. Virginia, Harrisonburg Division.

Oct. 22, 1990.

Myron C. Smith, Robert C. Fitzgerald, Fairfax, Va., for plaintiffs.

David N. Crump, Jr., Adamson, Crump & Sharp. P.C., Front Royal, Va., and Glenn M. Hodge, Douglas L. Guynn, WAW, Harrisonburg, Va., for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiffs in these consolidated actions own land in the town of Front Royal, Virginia. As a result of the town's failure to supply the plaintiffs' properties with sewer and water service in a timely fashion, as required by a decree of a state annexation court, this court previously held as a matter of law that the defendants had effectuated a taking of the plaintiffs' properties. *Front Royal & Warren County Industrial Park Corp. v. Front Royal,* 708 F.Supp. 1477, 1484 (W.D.Va.1989) ("*Front Royal I*"). The court also granted plaintiffs' mo-

tions for summary judgment on their Fourteenth Amendment Equal Protection claims. *Id.* at 1487. Subsequently these actions came before the court, sitting without a jury, for a trial on damages. The court heard testimony from January 30 to February 1 and also on February 21, 1990. Plaintiffs seek both actual and punitive damages. This court has jurisdiction pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), (a)(4). Both parties have submitted post-trial memoranda and proposed findings of fact and conclusions of law; this matter is now ripe for disposition.

The court fully set forth the facts which supported the finding that a taking had occurred in *Front Royal I* and will not recite them again here. The court will, however, briefly summarize the facts from its previous explication in order to place the present issue—the amount of damages which the plaintiffs claim—in context.

Plaintiffs are several individuals and a corporation who own land in an area annexed from Warren County by the Town of Front Royal (the "Town") under separate Annexation Court orders of 1976 and 1978. The orders of annexation required the Town to extend sewer service to the annexed areas as expeditiously as possible, but not later than five years after the entry of the orders. At the time the plaintiffs filed the present suits, the Town had not yet provided sewer service to any of the subject parcels. Because the failure to provide the sewer rendered the land unusable,[1] this court found that a taking in violation of 42 U.S.C. § 1983 had occurred. Additionally, although the Town had not made sewer available to the plaintiffs' properties, it had made the service available to other similarly situated parcels in the area. Most notably, the Town provided sewer to property belonging to the then Mayor of the Town, who was subsequently able to develop the property into a subdivision. Based on these facts, the court further found that the defendants' actions violated plaintiffs' Equal Protection rights.

**I**

Pursuant to Federal Rule of Civil Procedure 52(a), the court finds the following facts.

Plaintiffs Fred W. McLaughlin and his wife, Gladys L. McLaughlin, own as tenants in common a tract of land of approximately 55 acres known as Happy Creek Knolls. The McLaughlins purchased this tract of land for $14,350.00 as an investment property in July of 1964 when it was a part of Warren County. On December 31, 1976, the Town annexed a large parcel of land including the Happy Creek Knolls tract. Immediately before the annexation, the plaintiffs subdivided their property and it was taken into the Town as a subdivision. The property is zoned R–1, which allows the construction of single family homes on lots of at least 10,000 square feet.

The Front Royal and Warren County Industrial Park Corporation (the "Corporation") is a private stock company of which Fred W. McLaughlin is President. In 1973 and 1974 the Corporation purchased parcels of land totalling 86 acres in Warren County. The purchase price was approximately $107,000.00. The Town annexed this land, along with other property, in 1978. The Corporation's property was zoned industrial and had been subdivided into 16 lots before the annexation.

By Order of the annexation court in 1976, the Town was given a maximum of five years within which to provide sewer service to the Happy Creek Knolls property. In accordance with the annexation court's order, sewer was to have been available to the property no later than December 31, 1981. Sewer service was not actually available to the property until October 11, 1989.

Because sewer service is now available to the Happy Creek Knolls property, the court finds that the taking of that property has ceased. The plaintiffs are entitled, however, to appropriate damages for the period of the taking.

---

**1.** Indeed, as is detailed more fully below, at the time of the trial on damages the industrial park property had still not been provided the required sewer and the individuals plaintiffs' property had had sewer services for only a matter of months.

By Order of the annexation court in 1978, the Town had a maximum of five years within which to provide sewer service to the Industrial Park property. In 1983 the annexation court granted the Town a two year extension of the sewer provision date. In accordance with the annexation court's order, the property was to be provided with sewer no later than December 31, 1985. As of the date of trial, sewer service was not yet fully available to the Industrial Park property.[2]

The court finds that the failure of the Town to provide sewer service in a timely fashion was the sole reason why the plaintiffs were unable to develop their property: the defendants' failure to provide appropriate sewer service prevented the plaintiffs from putting their property to its fullest and best use. Even though at various times during the relevant period the property was not appropriately configured to comply with local zoning ordinances, the court finds that this was due entirely to the absence of sewer service. For the plaintiffs to have undertaken the efforts necessary to comply with the ordinances when it was readily apparent that sewer service would still be unavailable, thus leaving the property still unsalable, would have been futile.

## II

As noted previously, the sole issue before the court is the amount of damages to which the plaintiffs are entitled. The court's previous Orders have established that a constitutional taking has occurred and that the defendants are not immune from liability for damages. Some of the evidence offered at the hearing on damages represented efforts of the parties, principally the defendants, to offer new evidence which would bolster their arguments in opposition to the court's previous rulings on liability. The court cautioned counsel on several occasions that it would consider only the evidence adduced at the hearing solely in regard to the issue of damages as the liability issues had previously been resolved. Whether such non-damages evidence was offered for the purpose of making a record is immaterial; it was not considered on the damages issue and obviously was not considered on the liability issue.

### A. Compensatory Damages

■ A takings action can fall under two constitutional provisions, the fifth amendment of the United States Constitution or 42 U.S.C. § 1983.[3] In *Front Royal I*, this court found that the defendants had effectuated a compensable taking by violating the plaintiffs' due process rights under § 1983. That the plaintiffs' action arose under § 1983 and not the fifth amendment does not affect the appropriate measure of damages to which they are entitled. *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 n. 3 (11th Cir.1987) [*Wheeler III*].[4]

2. Because the Industrial Park property was taken into the Town already subdivided, the Town was required to provide service to each of the lots, not merely to one point on the edge of the entire tract. Service is currently available to some of the Industrial Park lots but not the majority.

3. The fifth amendment, applicable to the states through the Fourteenth Amendment, provides "nor shall private property be taken for public use, without just compensation." Though the government may take property pursuant to formal condemnation proceedings, condemnation for "public use" is not a constitutional requisite. Government regulation can so restrict the use of land that it constitutes a taking. *First Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 316, 107 S.Ct. 2378, 2386, 96 L.Ed.2d 250 (1987). Even where no regulation is involved, government actions which interfere with a landowner's beneficial use of property can constitute a taking. *Stoddard v. Western Carolina Regional Sewer Authority*, 784 F.2d 1200, 1206 (4th Cir.1986). Takings which do not result from condemnation proceedings are technically not entitled to fifth amendment just compensation; however, such takings may be the basis of a 42 U.S.C. § 1983 claim if they violate fourteenth amendment due process rights. *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 270 n. 3 (11th Cir.1987). A governmental taking need not be permanent; the government must compensate the landowner even if a taking is temporary. *First Lutheran Church*, 482 U.S. at 318–319, 107 S.Ct. at 2387–88.

4. *Wheeler* was appealed from the district court on four separate occasions. The court will cite to both the third and fourth appellate court decisions herein.

The question of which measure of damages the court should employ in this case is hardly clear. The court has looked to the vast array of takings jurisprudence and cannot find definitive precedent on the issue before it. As noted previously, this case does not involve condemnation proceedings, nor does it concern a taking which resulted from an unconstitutional regulation. The defendants effectuated the taking by failing to act on the annexation court's order. However, when examined in light of the Eleventh Circuit's definition of a regulatory taking in *Wheeler III*—"a taking that is ultimately invalidated by a court"—*id.*, the facts of this case can most appropriately be analogized to a regulatory takings case.[5] Even so, the lack of definitive precedent on compensating a temporary regulatory taking compels the court to examine the relevant case law.

■ Just compensation for the government's permanent acquisition of private property is the property's fair market value at the time of the taking. *Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984). In a temporary taking, however, "the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period." *First Lutheran Church*, 482 U.S. at 319, 107 S.Ct. at 2388; *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1580–81 (Fed.Cir.1990) (just compensation "is the value of the use of the property during the temporary taking, *i.e.*, the amount which the owner lost as a result of the taking."); *Nemmers v. City of Dubuque*, 764 F.2d 502, 504–05 (8th Cir.1985) ("for a temporary taking, the government is responsible for compensating the owner for the interim during which it effected the taking.").

The issues before the Supreme Court in *First Lutheran* unfortunately did not include how to measure appropriately "the value of the [temporary] use of the land" in temporary regulatory takings cases. The Court offered some guidance, however, when it held that a temporary regulatory taking is no different from the government's temporary use of private property and should be similarly compensated.[6] *First Lutheran*, 482 U.S. at 318–19, 107 S.Ct. at 2387–88. Indeed, the Court contemplated this measure of damages for temporary regulatory takings—that just compensation for such a taking should be determined as is just compensation for the temporary use of private property—on two occasions prior to *First Lutheran*. In *United States v. Dow*, 357 U.S. 17, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958), the Court stated that if the government were to abandon a condemnation proceeding, the taking would be temporary and "[i]n such cases compensation would be measured by the principles normally governing the taking of a right to use property temporarily." *Id.* at 26, 78 S.Ct. at 1046. Justice Brennan similarly expressed this in his dissent in *San Diego Gas & Electric Co. v. San Diego*, 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981). In his discussion of the proper measure of relief in a temporary regulatory taking, Justice Brennan stated, "Rules of valuation for temporary 'takings' may be particularly useful ... although additional rules may need to be developed." *Id.* at 659, 101 S.Ct. at 1308 (Brennan, J. dissenting) (citations omitted).

---

**5.** Although the taking at issue in this case is technically not a "regulatory taking," the cases concerning regulatory takings are analogous for the purpose of determining the appropriate compensation. As in a regulatory taking, the defendants in this case have prevented the plaintiffs from developing their property as they chose without initiating formal condemnation proceedings. The City Council in *Wheeler* passed an ordinance forbidding the plaintiff to build, whereas the Town of Front Royal made the conscious decision not to act according to the mandate of the annexation court's order.

The governing bodies in both cases took affirmative steps to deny unconstitutionally the plaintiffs use of their property, and therefore the facts are comparable.

**6.** In *First Lutheran*, the Court found that temporary regulatory takings were compensable by comparing them to takings in which the government temporarily exercises its right to use private property, in which cases the owners are entitled to compensation for the temporary use. *First Lutheran*, 482 U.S. at 318–19, 107 S.Ct. at 2387–88.

■ Although the Supreme Court has yet to rule definitively on the proper measure of just compensation in a temporary regulatory taking, some of the United States Courts of Appeals which have addressed the issue have adopted Justice Brennan's approach in *San Diego Gas. See Nemmers,* 764 F.2d at 505 n. 2. In so doing, the courts have formulated a computation for damages which parallels that used for temporary use of private property takings.[7] *See Wheeler III,* 833 F.2d at 271; *Nemmers,* 764 F.2d at 505.

The Eleventh Circuit recently addressed the issue of measuring damages from a temporary regulatory taking in a case similar to this one, *Wheeler v. City of Pleasant Grove,* 896 F.2d 1347 (11th Cir.1990) [*Wheeler IV*]. The plaintiff in *Wheeler* had obtained a building permit to construct an apartment complex on his property. After community opposition to the project, the City Council passed an ordinance which forbade the construction of the complex. Wheeler brought his action under 42 U.S.C. §§ 1983 and 1985. A federal district court found that the ordinance, as applied to the plaintiffs, was unconstitutional,[8] *Wheeler III,* 833 F.2d at 268–69, even though it did not deny the plaintiff all use of his property. *Wheeler IV* at 1351.

In *Wheeler III,* the Eleventh Circuit set forth the following guidelines by which the district court was to determine the amount of damages suffered by the plaintiffs:

In the case of a temporary regulatory taking, the landowner's loss takes the form of an injury to the property's poten-

tial for producing income or an expected profit. The landowner's compensative interest, therefore, is the return of the portion of fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction.

*Wheeler III,* 833 F.2d at 271 (citations omitted) (footnote omitted).

On remand, the district court chose not to follow the appellate court's instructions, finding instead that the plaintiffs could recover nothing because "the value of the property had increased despite the ordinance and since the ordinance had not destroyed the highest and best use of the land, 'the fair market value of the ... property was not diminished by the enactment of [the ordinance].'" *Wheeler IV,* 896 F.2d at 1350 (citing the memorandum opinion of the district court). Once again on appeal, however, the Eleventh Circuit reversed. While noting that the land's fair market value probably did not decline as a result of the government action, *id.* at 1351, the appellate court rejected the district court's determination that the property's increase in value over the period of the taking necessarily negated the plaintiff's right to recover damages.[9] Repeating its previous instructions for adequately compensating the plaintiff, the Eleventh Circuit

---

7. The method for determining appropriate damages for cases in which the government has exercised its right to temporarily use private property is well established. In such cases, the government essentially takes over an ongoing concern of the plaintiff, and just compensation is the fair rental value of the property over the period of the taking. *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949) ("[T]he proper measure of compensation ... is the rental that probably could have been obtained.") For example in *Yuba,* where the government had temporarily taken the mineral rights in the plaintiff's property, the Federal Circuit noted that "the usual measure of just compensation for a temporary taking ... is the fair rental value of the property for the period of the taking." *Yuba,* 904 F.2d at 1581.

8. The court further held that the City Council had arbitrarily and capriciously enacted and implemented an ordinance which was confiscatory in nature and had no rational purpose. *Wheeler III,* 833 F.2d at 268–69.

9. The Supreme Court has also rejected the proposition that "the difference between the market value of the fee on the date of the taking and its market value on the date of its return" was the appropriate measure of just compensation for a temporary taking because "there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy." *Kimball Laundry Co. v. United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949).

held that the district court should have determined the "difference in the fair market value of appellants' right to develop their property when they received their building permit and the fair market value of what remained after the City's actions against appellants." *Id.* Applying this method, the appellate court took the amount of the plaintiff's interest in the undisputed fair market value, at the time of the taking, of the complex which appellants had a right to build, and subtracted from that the plaintiff's interest in the value of the land only to get the "difference in fair market value lost as a result of the regulatory restrictions." *Id.* The court then computed the market rate of return on that amount to arrive at the correct amount of damages. *Id.* at 1352.

To determine the appropriate computation of damages in the *Wheeler* cases, the Eleventh Circuit relied upon the Eighth Circuit's analysis in another temporary regulatory takings case, *Nemmers v. City of Dubuque*, 764 F.2d 502 (8th Cir.1985). In *Nemmers*, the plaintiff had invested in developing his land as an industrial park. The land was subsequently annexed and zoned residential, and the district court found that a temporary taking had occurred. The Eighth Circuit held that the proper method for calculating the damages which resulted from the taking was to determine "the difference between the property's fair market value when zoned [for industrial use] and its fair market value when zoned [for residential use]." *Id.* at 505. That amount, plus the return over the number of years at the appropriate interest rate, was the plaintiffs just compensation. *Id.*

This court finds the opinions of the Eighth and Eleventh Circuits persuasive on the appropriate measure of damages for a temporary regulatory taking. Both *Nemmers* and *Wheeler* indicate that, in computing damages, the court should determine the market value as of the date of the taking. *Wheeler*, 896 F.2d at 1351; *Nemmers*, 764 F.2d at 504. This is consistent with permanent takings jurisprudence, which bases just compensation on the fair market value at the date of the taking. Furthermore, the approach mirrors that

used in takings involving the temporary use of private property—in which cases the owners are compensated for the period of use only—as the Supreme Court in *Dow* and Justice Brennan in *San Diego Gas* indicated would be proper. By determining the difference in value between what the plaintiff would have had absent the taking and what remained after the taking became effective, and adding the appropriate interest, the court can grant a remedy which is fair and adequate. The evaluation accounts for the fact that the owner still retains the property after the taking is invalidated and thus the plaintiff is justly compensated.

■ Before the court can apply the damages formula to the case at hand, it must briefly address alternative damages calculations proposed by the parties. During the hearing on damages, and in the parties' briefs on damages, the parties offered evidence as to the appropriateness of factors besides fair market value which the court could consider in determining the appropriate amount of compensatory damages. In particular, the plaintiffs seek economic redress for development expenses which accrued during the period of the taking. In essence, the plaintiffs suggest that they are entitled to compensation for consequential damages.

Fifth Amendment takings jurisprudence conclusively establishes that when the government effectuates a taking, "[t]he owner is to be put in the same position monetarily as he would have occupied if his property had not been taken." *United States v. Reynolds*, 397 U.S. 14, 15–16, 90 S.Ct. 803, 804–05, 25 L.Ed.2d 12 (1970). Consequently, the Court has indicated in both permanent and temporary takings cases that just compensation does not include the consequential damages which an owner might suffer as a result of the taking. *United States v. General Motors Corp.*, 323 U.S. 373, 380, 65 S.Ct. 357, 360, 89 L.Ed. 311 (1945) ("[T]hat which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of the physical thing, and that damage to those rights of ownership does not in-

clude losses to his business or other consequential damage." (footnote omitted)). Indeed, courts have uniformly held that lost profits,[10] lost opportunities, and other consequential damages suffered because of a taking are not compensable. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 511, 99 S.Ct. 1854, 1857, 60 L.Ed.2d 435 (1979) ("[F]air market value does not include the special value of the property to the owner arising from its adaptability to his particular use."); *United States ex rel. Tennessee Valley Authority v. Powelson,* 319 U.S. 266, 282, 63 S.Ct. 1047, 1056, 87 L.Ed. 1390 (1943) ("[T]he sovereign must pay only for what it takes, not for the opportunities which the owner may lose."); *Yuba,* 904 F.2d at 1581–1582 (in a temporary taking of mineral rights, the difference in the value of the property's gold during the taking period and after the taking is "precisely the kind of claim for consequential damages—here, lost profits—that is not an appropriate element of just compensation for the temporary taking of property."); *Helenic Center, Inc. v. Washington Metro Area Transportation Authority,* 815 F.2d 982, 984 (4th Cir.1987) ("ordinarily, indirect costs to the owner resulting from the taking ... are not part of the just compensation which the owner is entitled to recover."); *United States v. 1735 N. Lynn St., Situated in Rosslyn, VA,* 676 F.Supp. 693, 701 (E.D.Va.1987) (Damages for frustration of renovation plans are impermissible because "[t]he Fifth Amendment allows only fair market value, it does not guarantee a return on investment."). These cases clearly indicate that consequential damages are not appropriate in takings cases.

Despite the overwhelming authority against awarding consequential damages, the plaintiffs have noted that many courts have espoused the principle that courts are not bound by a specific formula in determining just compensation. *United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961); *United States v. Cors,* 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949); *United States v. Toronto, Hamilton & Buffalo Navigation Co.,* 338 U.S. 396, 402, 70 S.Ct. 217, 221, 94 L.Ed. 195 (1949). Rather, courts should examine the equities of a specific case to ascertain, in fairness, the appropriate amount of damages. *United States v. Fuller,* 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973); *A.G. Davis Ice Co. v. United States,* 362 F.2d 934 (1st Cir.1966); *United States v. Lee,* 360 F.2d 449, 452 (5th Cir. 1966); *Foster v. United States,* 2 Cl.Ct. 426, 446 (1983). The plaintiffs advance compelling arguments that equity and fairness concerns should compel this court to allow them damages beyond those ascertained by the formula governing temporary regulatory takings. They allege that economic relief should lie for certain acts, aside from the "taking" act of not providing sewer, which the defendants undertook during the course of the takings.[11]

During the period of the takings, the Town of Front Royal passed two measures which increased the plaintiffs' expense of developing their property. The first, effected in 1984, was a raise in the Town's front foot charge for sewer line extension from $6.00 per linear foot to $15.00 per linear foot. Because the Town should have provided sewer service to the Happy Creek

**10.** When courts have awarded damages akin to lost profits, the government had taken an existing business or going concern. *See Kimball Laundry,* 338 U.S. at 15, 69 S.Ct. at 1442 (one element of just compensation was whatever "demonstrable loss of going-concern value" the taking caused.). In this case, the taking did not involve an ongoing concern.

**11.** Although the plaintiffs make claims for lost profits and interest income caused by a lack of sewer service, the court need not address them separately. In *Wheeler,* the Eleventh Circuit held that the formula it used for compensating a temporary regulatory taking—the measure this court has adopted—accounted for the landowner's loss of "the property's potential for producing income or an expected profit." *Wheeler III,* 833 F.2d at 271. Moreover, specific claims of opportunity costs clearly fall within the scope of consequential damages which are routinely denied in takings cases. *See Coastland Corp. v. Third National Mortgage Co.,* 611 F.2d 969, 977 (4th Cir.1979), *Carley Capital Group v. City of Newport News,* 709 F.Supp. 1387 (E.D.Va.1989). *Cf. Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983).

Knolls property by 1983, the higher front foot charge would not have applied to that property had the town abided by the annexation order. The Town had an extension until 1985 to provide sewer to the Industrial Park, however, and so the plaintiffs would not have had the benefit of the lower cost for sewer line extension to that property even if the Town had complied with the order.

The second Town action causing economic damage to the plaintiffs was the passage of a slope ordinance in 1989.[12] Again, had the Town not willfully disobeyed the annexation court's order, the plaintiffs would not have had to comply with the slope ordinance. Because of the ordinance, however, the plaintiffs are unable to develop some of their lots, and additional lots will require a special use permit.

These facts surrounding the plaintiffs' situations present a strong case for which equity and fairness demand compensation for consequential damages. The losses plaintiffs suffered at the hands of the Town government do indeed seem greater than the amount which plaintiffs would recover under the formula endorsed in *Wheeler* and *Nemmers*. Although the Eighth and Eleventh Circuits did not specifically hold that just compensation for a temporary regulatory taking does not include consequential damages,[13] this court sees no reason to invoke an exception to the well-established rule that consequential damages are not recoverable. The facts in this case are indeed compelling ones for this court to attempt to forge new ground in fashioning an appropriate measure of damages by issuing a rule that would grant compensatory damages; however, absent guidance from this circuit to do so, the court will follow the well-reasoned approaches of the Eighth and Eleventh Circuits. Accordingly, the court will not award relief for the plaintiffs' consequential damages.

■ In addition to the lack of authority for granting consequential damages, another reason exists for denying them in this case. Concededly, because economic evaluations often depend upon assumptions, some amount of speculation is inherent in establishing market values. *United States v. Miller*, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943); *Foster v. United States*, 2 Cl.Ct. 426, 446–47 (1983). Nonetheless, a court, in its consideration of just compensation, must be wary of those elements of damages which are speculative and conjectural. *Olson v. United States*, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934); *Foster*, 2 Cl.Ct. at 446. The court finds that the evidence in the record pertaining to consequential damages is not sufficiently founded to be the basis for compensatory relief.

Even if this court concluded that the increase in the front foot charge is a consequential damage for which the owners of the Happy Creek Knolls property could be compensated, the record contains no evidence indicating how many linear feet of sewer line are at issue. Thus, the court could not compute the proper amount of damages suffered due to the higher front foot charge. Likewise, had the court found that the losses attributable to the slope ordinance were compensable consequential damages, the plaintiffs must have proved that they indeed sustained such damages by showing that they would have sold or developed the properties subject to the ordinance before it was passed in order to recover for those losses. If no demand for the affected lots existed before the regulation became applicable, then the plaintiffs suffered no damages because of it. Based on the evidence before it, the court could not find that the lots subject to the slope ordinance would have been sold or developed prior to 1989 even if the lots had sewer. Consequently, the court concludes that, even if it could appropriately award consequential damages, the evidence does not sufficiently establish the extent—if any—to which the plaintiffs sustained such damages.

---

**12.** The ordinance prevents development of slopes of 25% or greater and requires a special use permit for development of slopes between 15% and 25%.

**13.** Neither court awarded compensatory damages, nor is it apparent that the plaintiffs in those cases asked for such an award.

■ Having determined the appropriate method for measuring damages, the court must now apply the formula to the case at hand. The plaintiffs offered several experts on the issue of damages. Although the defendants cross-examined these witnesses, they did not present their own experts to testify on damages. They have relied instead on their assertion that the plaintiffs have not been able to complete their subdivisions because of their own failure to comply with various zoning requirements, not because of the Town's failure to provide sewer service. Thus, the defendants argue, their temporary taking did not cause any damages beyond those already resulting from the plaintiffs' noncompliance with applicable regulations. The court believes that this contention is fatally flawed because, to put it in the vernacular, it puts the cart before the horse: it assumes that the plaintiffs would have performed objectively futile activities, hoping that such actions would spur the defendants to meet obligations which, despite a court order, they had refused to do. Consequently, if the plaintiffs' experts' testimony on damages meets acceptable standards for determining the applicable market values, the court will use them to determine just compensation.

The plaintiffs' expert on the market value of the land used a comparable sales approach to determine the value of both properties at the dates of the takings. The comparable sales approach—analyzing sales of similar commercial property in order to arrive at a fair market value—is generally accepted as providing the best evidence of fair market value. *United States v. 179.26 Acres of Land,* 644 F.2d 367, 371 (10th Cir.1981); *Houser v. United States,* 12 Cl.Ct. 454, 472–73 (1987). The Eighth Circuit has approved the use of the evidence of comparable sales as the " 'best evidence' of damages on the rationale that comparable sales 'on the whole reflect the principle of a willing seller and a willing buyer concluding arms-length negotia-

tions.' " *Nemmers,* 764 F.2d at 505 (citing *United States v. 47.14 Acres of Land, More or Less,* 674 F.2d 722, 725 (8th Cir. 1984)).

The comparability of real estate sales involves such factors as time of transaction, location of the property, quantity and quality of property sold, nature of the sale, the primary interests of the parties as well as other factors peculiar to a particular transaction. The plaintiffs' experts engaged in such an examination in order to estimate the fair market values of the properties, both with and without sewer. Because they supported their findings with a strong factual and analytical framework, and as their testimony was essentially unrebutted, the court adopts their figures in order to obtain the appropriate amount of damages.

In 1981, the time of the taking of the McLaughlin property, the fair market value of that property was $148,000 with sewer and $66,000 without sewer, leaving a difference of $82,000. The period of the taking, that time in which the City ought to have provided sewer but did not, extended from January 1, 1981, to October 11, 1989. Applying the applicable interest rates, with interest compounded annually, to $82,000 for the period of December 1981 to October 11, 1989,[14] the court finds that the amount of just compensation is $176,526.56.

In 1985, the time of the taking of the Industrial Park property, the fair market value of that property was $405,000 without sewer and $810,000 with sewer, leaving a difference of $405,000. Because the record shows that sewer lines run through three of the sixteen lots in the Industrial Park, and as the evidence does not show the value of the remaining thirteen lots with and without sewer service at the time of the taking, the court will reduce the $405,000 difference in value by three-sixteenths, leaving an amount of $329,062.50. The period of the taking has extended from January 1, 1985 to the present time. Again

**14.** The plaintiff's experts provided the market rates of return through December of 1988. Because the record contains no evidence of the applicable interest rates from December 31, 1988 through the present, the court has used the Administrative Office of the United States Courts 52–week Treasury Bill Rate Table of Changes to determine the appropriate amount of interest accrued after January 1, 1989.

using the interest rates indicated above, the just compensation for the Industrial Park property to date is $489,072.59. The owners of the Industrial Park property shall continue to receive compensation, determined as this court has outlined, until the defendants cease their taking and provide the sewer service mandated by the annexation court.

## B. Punitive Damages

The Supreme Court has endorsed punitive damages awards in § 1983 actions. *Smith v. Wade*, 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983). Such damages are appropriate when the defendants violate federal law with evil motive or intent, or when they act with "reckless or callous disregard for the plaintiff's rights" *Id.*

The Fourth Circuit summarized the Supreme Court's precedent for awarding punitive damages in *Stephens v. South Atlantic Canners, Inc.*, 848 F.2d 484 (4th Cir.1988). The appellate court stated that such damages are "an extraordinary remedy ... designed to punish and deter particularly egregious conduct." *Id.* at 489 (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981)). In *Cooper v. Dyke*, 814 F.2d 941, 948 (4th Cir.1987), the court discussed the standard for awarding punitive damages, stating, "the callous indifference required for punitive damages is essentially the same as the deliberate indifference required for a finding of liability on the § 1983 claim." Although this court's determination that the defendants effected a deprivation of the plaintiffs' rights under § 1983 and the equal protection clause could support a punitive damages award, *see Smith*, 461 U.S. at 51–55, 103 S.Ct. at 1639; *Cooper*, 814 F.2d at 948, the evidence on record does not satisfy this court that such an award is meritorious. The plaintiffs' contention that the defendants need only act with "reckless or callous indifference to the [plaintiffs'] federally protected rights" is correct; they need not show malicious or evil intent. *Piver v. Pender County Bd. of Education*, 835 F.2d 1076, 1082 (4th Cir.1987).

In its opinion granting summary judgment on the taking issue, this court concluded that the "defendants ought to have known, and that a reasonable person in their shoes would have known, that the defendants were under a legal obligation to provide sewer service to the parcels in question." *Front Royal and Warren County Industrial Park Corp. v. Town of Front Royal*, and *McLaughlin, et ux., v. Town of Front Royal*, 708 F.Supp. 1477, 1482 (W.D.Va.1989). However, this court did not make a finding regarding the defendants' malicious intent or callous indifference. The same is true regarding the equal protection claim. The basis for this court's summary judgment on the equal protection claim was not that the defendants had acted with "invidious discrimination", but because no permissible state interest existed to which defendants' decision could bear a rational relationship. *Id.* at 1487. After reviewing the evidence on damages, the court reaches the same conclusions as to the defendants' subjective intent.

The record contains no evidence showing that the four council members who actually voted on the plaintiffs' application for sewer service were reckless or callously indifferent to the plaintiffs' rights. The Mayor and the Town Manager testified about the meetings at which the council discussed the applications for sewer, but the court cannot attribute their testimony to the voting members of council. Nor can the court base an award of punitive damages on inferences that the defendants acted egregiously or with malice. *Stephens*, 848 F.2d at 492. Though the evidence does show that the Town Attorney told the council, "You are required to provide [sewer] to whoever wants it within the entire annexed areas", the record does not sufficiently demonstrate that the defendants acted contrary to their understanding—however skewed or incorrect it may have been—of this advice. As to the Town Manager and Mayor Marlow, neither voted on the sewer service applications. Moreover, the strong evidence of Mayor Marlow's purported bad faith is contradicted by the factual differentiations between his application for sew-

er and those of the plaintiffs. Although the court is not completely convinced that the plaintiffs' allegations of corruption, impropriety and graft on the part of the defendants are without some merit, the record does not contain the substantially high measure of evidence necessary for a punitive damages award. Consequently, the court will not award punitive damages.

Because the plaintiffs brought these actions under 42 U.S.C. § 1983, the court has discretion to award attorneys fees to the prevailing party under 42 U.S.C. § 1988. The court believes that this is an appropriate case for such an award. The Front Royal–Warren County Industrial Park, Inc., expended $68,096.25 for legal fees and costs in this litigation as of December 4, 1989. The plaintiffs in the *McLaughlin* case incurred similar expenses of $39,371.30 through the same date. The court hereby orders such amounts, plus any additional fees incurred from December 4, 1989 to the present date as may be shown to the court, to be paid by the defendants as reasonable attorney's fees.

An appropriate order shall this day issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, the court hereby finds as follows:

(1) The Front Royal and Warren County Industrial Park Corporation, plaintiffs in Civil Action No. 87–0019–H, are entitled to recover compensatory damages in the amount of $489,072.59, costs and attorney's fees incurred through December 4, 1989 in the amount of $68,096.25, plus additional costs and fees as may be shown to the court; and

(2) Fred W. McLaughlin, et ux., plaintiffs in Civil Action No. 87–0020–H, are entitled to recover compensatory damages in the amount of $176,526.56, costs and attorney's fees incurred through December 4, 1989 in the amount of $39,371.30, plus additional costs and fees as may be shown to the court.

In light of these findings, it is hereby

ADJUDGED AND ORDERED

as follows:

(1) The indicated damages amounts shall be paid by the defendants.

(2) The plaintiffs herein shall make an appropriate showing of such additional attorney's fees and costs to the court by November 12, 1990.